IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HB PRODUCTIONS, INC., | CIV. NO. 19-00487 JMS-KJM |
| Plaintiff, | ORDER SUSTAINING PLAINTIFF'S OBJECTIONS, ECF NO. 79, TO THE MARCH 29, 2022 FINDINGS AND RECOMMENDATION, ECF NO. 78 |
| vs. | |
| MUHAMMAD FAIZAN, | |
| Defendant. | |

## ORDER SUSTAINING PLAINTIFF'S OBJECTIONS, ECF NO. 79, TO THE MARCH 29, 2022 FINDINGS AND RECOMMENDATION, ECF NO. 78

### I.  INTRODUCTION

Plaintiff HB Productions, Inc. ("Plaintiff") objects under 28 U.S.C. § 636(b)(1) to Magistrate Judge Kenneth J. Mansfield's March 29, 2022 Findings and Recommendation ("F&R"), ECF No. 78, to deny Plaintiff's Motion for Default Judgment Against Defendant Muhammad Faizan ("Defendant") due to lack of personal jurisdiction.  ECF No. 79.  As discussed below, the court concludes that it has personal jurisdiction over Defendant.  Accordingly, the court SUSTAINS Plaintiff's Objections and REJECTS the F&R.

## II. <u>BACKGROUND</u>

**A.     Procedural Background**

On September 9, 2019, Plaintiff filed a complaint against Defendant and multiple unnamed "doe" defendants.  ECF No. 1.  Plaintiff subsequently filed the first and second amended complaints against Defendant only.  ECF Nos. 40, 64.  Despite being served with copies of at least the first and second amended complaints and the Motion for Default Judgment underlying this Order, *see* ECF Nos. 41, 65, & 75-9, Defendant has yet to make an appearance in or otherwise respond to this case.

Plaintiff sought entry of default judgment based on the first amended complaint three separate times.  In the first two, the magistrate judge found and recommended that the court deny entry of default judgment because Plaintiff failed to establish that its claims against Defendant were "sum certain" as required by Federal Rule of Civil Procedure 55(b)(1).  *See* ECF Nos. 46, 52.  Although the first finding and recommendation was not appealed to this court, *see* ECF No. 49, the second was, and the court adopted it in full, *see* ECF Nos. 53 & 54.  In addressing Plaintiff's third motion for default judgment, ECF No. 55, the magistrate judge found and recommended that the court deny entry of default judgment for a different reason—lack of personal jurisdiction.  *See* ECF No. 58; *see also In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("To avoid entering a default judgment that

can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place.").  Plaintiff objected to that finding and recommendation, ECF No. 59, but the court overruled the objection and provided Plaintiff the opportunity to file a second amended complaint, ECF No. 60.  The court held that Plaintiff's allegations "failed to demonstrate that [the foreign] Defendant's activities were expressly aimed at the United States or Hawaii" and thus that "Plaintiff failed to show that Defendant's contacts [were] sufficient to invoke nationwide [personal] jurisdiction pursuant to [the federal long-arm statute]." *Id.* at PageID # 565.  To a large degree, the court grounded its decision in *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020), and *42 Ventures, LLC v. Rend*, 2020 WL 6257069 (D. Haw. Oct. 23, 2020), *affirmed in part*, 2021 WL 5985018 (9th Cir. Dec. 16, 2021) (mem.).  *See* ECF No. 60 at PageID ## 557–62.

Plaintiff filed the Second Amended Complaint ("SAC") on December 2, 2020, ECF No. 64, which attempted to "allege facts sufficient to comply with *Wanat*'s newer guidance on express aiming," ECF No. 60 at PageID # 565.  The action was stayed pending an appeal in *42 Ventures*.  *See* ECF No. 67.  The stay was lifted on December 16, 2021, when the Ninth Circuit issued its decision in *42 Ventures*.  *See* ECF Nos. 68, 68-1.  On January 14, 2022, Plaintiff requested that the Clerk of Court enter default against Defendant for failure to appear or

3

otherwise defend the SAC.  ECF No. 73.  The Clerk entered default on January 19, 2022.  ECF No. 74.

On January 27, 2022, Plaintiff filed his latest Motion for Default Judgment under Federal Rule of Civil Procedure 55(b)(2), seeking injunctive relief and an award of $179,668.27 for various damages and costs.  ECF No. 75.  The magistrate judge issued the March 29, 2022 F&R recommending that the request for entry of default judgment be denied.  *See* ECF No. 78.  He found that Defendant's allegations of direct infringement "[did] not demonstrate express aiming at the United States" and, likewise, that Defendant's allegations of contributory infringement—namely, operating his websites—"fail[ed] to establish that Defendant's intentional act of operating [those websites] [was] expressly aimed at the United States."  *Id.* at PageID ## 775, 780.  Plaintiff had thus failed to establish that Defendant "purposefully directed his actions toward the United States," and the court lacked personal jurisdiction over Defendant as a result.  *Id.* at PageID # 780.  Plaintiff timely objected to the F&R on March 30, 2022.  *See* ECF No. 79.

## B.    Factual Background

In the SAC, Plaintiff claims that Defendant engaged in direct and contributory infringement of Plaintiff's copyright on the motion picture *Hellboy*, in violation of the Copyright Act of 1976, 17 U.S.C. § 101 et seq.  ECF No. 64 at

PageID # 582, ¶¶ 1–2.  Plaintiff seeks both injunctive and monetary relief.  *See id.* at PageID ## 624, 626–27.

The SAC alleges four principal actions in support of Plaintiff's infringement claims:  First, Defendant "ripped" legitimate copies of *Hellboy* to create pirated digital copies, *id.* at PageID # 602, ¶¶ 71–73; second, Defendant distributed full or partial pirated copies of *Hellboy* through a "torrent" network, *id.* at PageID ## 582–83, 587–88; third, Defendant operated websites that published downloadable torrent files, including the torrent files associated with the pirated copies of *Hellboy*, *see id.* at PageID ## 583–84, 601; and fourth, Defendant uploaded torrent files associated with *Hellboy* onto other movie piracy sites, *see id.* at PageID ## 585–86, ¶¶ 19–20.  Defendant was not physically present in the United States while committing the alleged actions—instead, Defendant sat behind his keyboard in Gujranwala, Pakistan.  *See id.* at PageID # 601, ¶ 68 ("Upon information and belief, Defendant resides in Gujranwala, Pakistan."); ECF No. 60 at PageID # 560 (order adopting prior findings and recommendation) ("Nor does Plaintiff allege any facts showing that Defendant . . . was physically present in the United States to upload his files.").

For the first action—ripping[1]—Defendant allegedly purchased a Blu-Ray-disc version of *Hellboy* from a United States retailer and bypassed the anti-copying protections on that Blu-Ray disc in order to create a directly infringing copy.  ECF No. 64 at PageID # 625, ¶ 182.  The SAC does not specify where or on what computer Defendant ripped the Blu-Ray disc.  Defendant also allegedly ripped a digital "streaming copy" of Hellboy that Defendant had purchased on Amazon.com, also a United States retailer.  *Id.* at PageID # 625, ¶¶ 183–84.  Defendant purchased and streamed that copy using a computer with a United States-based IP address[2] because, at the time, "geographic restrictions prevented [*Hellboy*] from being publicly performed (streamed) in Pakistan."  *Id.*, ¶ 183.  Although the SAC does not provide specifics, it is technologically possible that,

---

[1] "Ripping involves obtaining a reformatted copy of a DVD by extracting the contents of the DVD onto a different storage medium, in a different format than that of the original DVD," typically into a digital movie file.  *Disney Enters., Inc. v. VidAngel Inc.*, 2019 WL 13020419, at *2 n.3 (C.D. Cal. Feb. 26, 2019).  "[S]tream-ripping" is also possible, "whereby software tools, browser plugins or special websites are used to store [streamed] music or audio-visual content, such as YouTube videos, offline for later replay."  João P. Quintais & Joost Poort, *The Decline of Online Piracy: How Markets—Not Enforcement—Drive Down Copyright Infringement*, 34 Am. U. Int'l L. Rev. 807, 813 (2019).

[2] An "Internet Protocol address" is "[t]he unique 32-bit address that specifies the location of each device or workstation on the Internet."  IBM, *Dictionary of IBM & Computing Technology*, https://www.ibm.com/ibm/history/documents/pdf/glossary.pdf (last visited May 13, 2022).  This Order uses the term "United States-based IP address" because, unlike mailing addresses that map to objects fixed to the earth, IP addresses map to Internet-connected devices that can change locations.  Despite that possible imprecision, the practice of "geolocating" IP addresses to physical locations, such as cities, has become fairly reliable.

given the ubiquity of remote computing via leased virtual machines,[3] Defendant

purchased from and streamed to a computer in the United States despite residing

abroad.  The SAC does not specify where or on what computer Defendant *ripped*

the streaming copy.  The SAC implies that Defendant used a virtual machine in the

United States to *purchase* and *stream*, and that Defendant used his computer in

Pakistan to facilitate the remote connection to that virtual machine, but the SAC

does not specify on which of those computers Defendant conducted the ripping

actions.  *See id.* at PageID # 596, ¶ 52.

For the second action—distributing and reproducing pirated copies

through a torrent network—Defendant allegedly "sent . . . at least a piece of [a

digital copy of *Hellboy*] 16,942 times" "to specific IP addresses in the United

States using . . . BitTorrent," "one of the most common peer-to-peer file sharing

protocols."  *Id.* at PageID ## 587–88, 605, ¶¶ 22–24, 89.  Those pirated digital

copies were initially created through the ripping actions described above, making

Defendant the "initial seeder" of the digital copies and thus a contributory

infringer, according to the SAC.  *See id.* at PageID ## 608, 623, ¶¶ 102, 173.

---

[3] "A 'virtual machine' is a digital computing environment that replicates the functionality of a physical computer's operating system.  Virtual machines can be hosted on one physical computer and operated remotely by a user of another physical computer." *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 4 n.1 (1st Cir. 2021).

As an "initial seeder," Defendant both made available for transfer over the Internet the "target files," i.e., the digital copies of *Hellboy*, and created the "torrent files" associated with those target files.  *See id.* at PageID # 608, ¶ 102; *see also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1027 (9th Cir. 2013) (describing torrent architecture).  The persons who received or downloaded the target files over the BitTorrent network are referred to as "leechers."  *Fung*, 710 F.3d at 1028.  "Once [a] leecher has downloaded one or more pieces of [a target file], he, too, can be a seeder by sending other leechers the pieces that he has downloaded."  *Id.*  In that way, BitTorrent implements a hybrid peer-to-peer filesharing networking, permitting leechers to simultaneously receive different pieces of a target file from different seeders, instead of from a single seeder or central repository that can become overloaded with requests.  *See id.* at 1026–27; ECF No. 64 at PageID ## 605–06, ¶ 90.

Notably, after Defendant initially seeded the target files, the file-transfer process was largely hands-off from his perspective.  Defendant needed only to publish the torrent files corresponding to the target files on the web for others to download.  *See* ECF No. 64 at PageID ## 608–09, ¶¶ 103–11; *Fung*, 710 F.3d at 1027 (describing how initial seeders "make[] the torrent file available by uploading it to one or more websites . . . that collect, organize, index, and host torrent files").  After being downloaded by a prospective leecher, the torrent file

8

automatically facilitated connections between seeders and prospective leechers without further action from Defendant.  *See* ECF No. 64 at PageID ## 587–88, ¶ 24 (describing how Defendant "sent [copies of *Hellboy*] *automatically* to specific IP addresses in the United States using a BitTorrent Client" (emphasis added)); *see also Fung*, 710 F.3d at 1028 (describing the "tracker" functionality associated with torrent files).  Thus, assuming "the [Defendant] [left his] computer on and connected to the Internet, with [his] BitTorrent program running," "[his] job [was] essentially done."  *Fung*, 710 F.3d at 1028.  "[His] computer [would] continue to communicate with the tracker assigned to the torrent file [he] uploaded, standing ready to distribute the movie file (or, more accurately, parts thereof) to others upon request."  *Id.*

For the third action—operating torrent-file websites—Defendant allegedly operated at least six websites during the relevant period: the ongoing websites mkvcage.site, mkvcage.cc, and mkvcage.ws, and the now defunct websites mkvcage.nl, mkvcage.fun, and mkvcage.com (collectively, the "mkvcage websites").  ECF No. 64 at PageID ## 601, 602, 626.  Through those websites, Defendant allegedly published and promoted the torrent files corresponding to the target copies of the *Hellboy* movie.  *Id.*  In the words of the SAC:

> [Defendant's] websites provide torrent files that connect
> users to Torrent sources and/or sites that deliver copies of
> Plaintiff's Copyrighted Work.  The operators of these

> Torrent sources directly infringe Plaintiff's exclusive rights by providing unauthorized copies of the work . . . .
>
> Defendant knowingly and materially contributes to the aforementioned acts of infringement by supplying the website that facilitates, encourages, enables, and creates direct links between website users, infringing operators of the torrent services, and file copies provided by Defendant, and by actively encouraging, promoting, and contributing to the use of the website for blatant copyright infringement.

*Id.* at PageID ## 620, 622, ¶¶ 157, 166.

Defendant allegedly "uses or has used many United States ('US') based sources for operating [the mkvcage] websites." *Id.* at PageID # 589, ¶ 28. For example, "Defendant uses the nameserver company Cloudflare, Inc. (California), the domain Registrar and hosting service of Namecheap (Arizona), and the email service of the US Company Google (California) for his websites." *Id.* at PageID ## 589–90, ¶ 28. "Defendant specifically chose the US providers Namecheap and Cloudflare for the hosting and nameserver service for his website so that he could obtain US IP addresses." *Id.* at PageID # 597–98, ¶ 56; *see also id.* at PageID # 602, ¶ 73. Hosting websites on "US IP addresses," including IP addresses geolocated to Arizona, permitted Defendant to "overcome blacklist restrictions that US search engines and servers often apply to IP addresses of foreign based piracy websites," *id.* at PageID ## 597–98, ¶ 56, and to "ensure that

his US users can access his websites to pirate content at maximum speed," ECF No. 75-1 at PageID # 693.

Defendant also allegedly "used the US company PayPal to make a payment to Namecheap when registering the domain mkvcage.cc" and "particularly chose a US bank account provided by PayPal so that US users could seamlessly send donations in US dollars from US PayPal accounts." ECF No. 64 at PageID ## 590, 596–97, ¶¶ 28, 54. Further, "Defendant used the US social media platforms Twitter, Instagram and Reddit to promote his websites to the US audience." *Id.* at PageID ## 589–90, ¶ 28. The SAC also alleges that Defendant "obtains financial benefit from his users in US via advertising partners he directly contracted with that specifically designed advertisements for US consumers regardless of where the visitor is located." *Id.* at PageID # 598, ¶ 57.

For the fourth action—publishing torrent files on third-party websites—Defendant allegedly uploaded torrent files corresponding to the pirated copies of *Hellboy* onto the torrent websites 1337x.to and ibit.uno. *Id.* at PageID # 625, ¶¶ 182–86. For the 1337x.to website, the SAC further alleges that "Defendant seeded one or more copies of [*Hellboy*] on IP address 104.31.88.65 at a server in Texas that hosts the notorious piracy website 1337x.to." *Id.* at PageID # 585, ¶ 19. "By this act, Defendant directly infringed Plaintiff's exclusive rights of reproduction and distribution in Texas and thus the United States." *Id.* For the

ibit.uno website, the SAC further alleges that "Defendant uploaded [a pirated copy of *Hellboy*] on IP address 104.27.152.221 at a server in California that hosts the piracy website ibit.uno using his profile 'mkvcage.'"  *Id.* at PageID # 586, ¶ 20. "By this act, Defendant directly infringed Plaintiff's exclusive rights of reproduction and distribution in California and thus the United States."  *Id.*

On the basis of those four principal actions, the SAC asserts that Defendant has made contacts with the United States sufficient to justify this court having specific personal jurisdiction over Defendant under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2).  *See* ECF No. 64 at PageID # 585, ¶ 18.

### III.  <u>STANDARD OF REVIEW</u>

When a party objects to a magistrate judge's findings or recommendations, the district court must review de novo those portions to which the objections are made and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise.").  The district court may also recommit a matter to the magistrate judge with further instructions. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 674 (1980); Fed. R. Civ. P. 72(b)(3).  Under the de novo standard, the court reviews "the matter anew,

the same as if it had not been heard before, and as if no decision previously had been rendered." *Freeman v. DirecTV, Inc*., 457 F.3d 1001, 1004 (9th Cir. 2006). It is the court's obligation to arrive at its own independent conclusion about those portions of the magistrate judge's findings or recommendations to which a party objects. *United States v. Remsing*, 874 F.2d 614, 618 (9th Cir. 1989).

## IV.  ANALYSIS

The court starts by addressing a threshold question:  When a defendant uses the Internet to commit a digital tort, where do the defendant's actions occur? As addressed below, the court concludes that the defendant's actions occur at the location he or she reaches into, via the instrumentality of the Internet, and that contains the computer hardware that he or she manipulates to commit the tort.  Applying that conclusion to the factual allegations in this case, the court determinates that although Defendant did not commit any direct infringements in the United States, he did commit contributory infringements in the United States that are sufficient for personal jurisdiction under the purposeful availment test.[4]

---

[4] In the court's order sustaining the prior findings and recommendation, ECF No. 60, the court had no occasion to address a purposeful-availment theory—such a theory was not raised in Plaintiff's motion for default judgment or the objections underlying the court's order.  *See* ECF No. 55-1 at PageID ## 428–30 (making no purposeful-availment argument); ECF No. 59 at PageID ## 526–27 (same).

## A.    Legal Standards

Plaintiff bears the burden of establishing that personal jurisdiction is proper. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  In determining whether Plaintiff has met this burden, uncontroverted plausible allegations in the complaint must be taken as true. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).  "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).  Moreover, a court must disregard allegations that are implausible on their face, as it would at the motion-to-dismiss stage. *See CSTECHUS, Inc. v. NorthernZone, LLC*, 2021 WL 4974825, at *2 (S.D. Cal. Oct. 25, 2021) (applying the facial plausibility standard from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when denying a motion for default judgment).

Personal jurisdiction over an out-of-forum defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  The federal long-arm statute allows any district court in the United States to exercise personal jurisdiction "[f]or a claim that arises under federal law," over a defendant who "is not subject to jurisdiction in any state's courts of general jurisdiction," so long as "exercising jurisdiction is consistent with the United States

Constitution and laws."  Fed. R. Civ. P. 4(k)(2); *see also Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007).  Here, the first requirement is clearly met.  The third requirement—whether exercising personal jurisdiction over Defendant comports with due process—is the focus of this Order. The second requirement is analyzed in closing.

Regarding the third requirement, due process requires that a nonresident defendant have "'certain minimum contacts' with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Wanat*, 970 F.3d at 1208 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The type and amount of contacts required by the due process clause are a function of whether the plaintiff is asserting "specific" personal jurisdiction or "general" personal jurisdiction.  *See Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014).  "For a State to exercise [specific] jurisdiction [under its state long-arm statute] consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  *Id.* at 284.  The analysis under the federal long-arm statute is the same except for one difference: rather than "considering contacts between the [defendant] and the forum state, [the court must] consider contacts with the nation as a whole."  *Holland Am. Line Inc.*, 485 F.3d at 462.

In the Ninth Circuit, courts conduct a three-pronged inquiry to determine whether a nonresident defendant has sufficient "minimum contacts" with the forum to warrant the exercise of specific personal jurisdiction:

> (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[] himself of the privileges of conducting activities in the forum";
>
> (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and
>
> (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable".

*Wanat*, 970 F.3d at 1208 (quoting *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017)) (alteration in original).

### 1.    *Law Governing Which Test to Apply—Purposeful Direction or Purposeful Availment*

The first prong has been the subject of recent developments and clarifications in Ninth Circuit law, particularly in the context of Internet contacts. *See Mavrix*, 647 F.3d at 1229 ("[W]e have struggled with the question whether tortious conduct on a nationally accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed."); *see also Walden*, 571 U.S. at 290 n.9 ("We leave questions about virtual contacts for another day.").  The exact inquiry depends on the type of claim asserted and where the allegedly unlawful conduct occurred.  As a general matter, "[f]or claims sounding in contract, a

purposeful availment test is used; for claims sounding in tort[,] a purposeful direction test is used." *In re Boon Glob. Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019). Copyright claims sound in tort, thus suggesting that the purposeful direction test is applicable. *See Wanat*, 970 F.3d at 1208.

To answer the purposeful direction inquiry, the court applies a three-element "effects" test based on *Calder v. Jones*, 465 U.S. 783 (1984). *See Wanat*, 970 F.3d at 1208–09. The effects test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix*, 647 F.3d at 1228 (internal quotation marks and citation omitted). As to the second element—express aiming—courts must consider whether the relationship between the defendant, the forum, and the litigation, arose out of contacts the defendant itself created with the forum, and whether the defendant's contacts were with the forum, not merely with persons residing in the forum. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143 (9th Cir. 2017) (citing *Walden*, 571 U.S. at 284–85).

But the Ninth Circuit has recently "clarif[ied]" that the purposeful *availment* test is applicable and is satisfied "if the defendant has taken deliberate action within the forum state," regardless of whether that deliberate action is allegedly tortious or a violation of contract law. *Freestream Aircraft (Bermuda)*

*Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603–06 (9th Cir. 2018) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)).  Simply put, "the commission of a tort within the forum state usually supports the exercise of personal jurisdiction." *Id.* at 606.  Thus, for the purposes of this case, if Defendant committed the alleged tortious actions[5] within the United States, he would be subject to personal jurisdiction in the United States, "absent circumstances that would make such a suit unreasonable."  *Id.* at 600.[6]  On the other hand, if Defendant committed the alleged tortious actions outside the United States, the court would apply the purposeful direction test to all of Defendant's contacts with the United States.  *See Freestream*, 905 F.3d at 606; *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

---

[5] The relevant question is where the alleged tortious actions occurred, not where the tort was completed.  *See Climax Portable Mach. Tools, Inc. v. Trawema GmbH*, 2020 WL 1304487, at *3 (D. Or. Mar. 19, 2020) ("Given the Ninth Circuit's guidance in *Freestream Aircraft*, the threshold question is whether part of the alleged tortious conduct occurred in Oregon."). Differences between those two can arise when a tort requires an effect or condition that occurs at a location different from where the defendant acted.

For example, in *Calder*, 465 U.S. 783, the "defendants' intentional tort actually occurred in California," where the libelous article was eventually circulated by a non-party, despite the "article [having been] written and edited by the defendants in Florida for publication."  *Walden*, 571 U.S. at 286–88 ("[T]he tort of libel is generally held to occur wherever the offending material is circulated."  (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 777 (1984))). Notably, *Calder* formulated the "effects" test that governs the purposeful-direction inquiry for "conduct [that] takes place *outside* the forum."  *See Wanat*, 970 F.3d at 1209 (emphasis in original).  Given the facts of *Calder* and the intended application of the "effects" test, it would make little sense for the "out-of-forum" versus "in-forum" distinction to focus on where the tort "occurred," i.e., where the last remaining element of a tort was completed.

[6] Circumstances that would make a suit unreasonable include coming into contact with the forum through non-purposeful ways, e.g., by fortuitous conditions or random chance.  *See, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).

*L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (holding that the purposeful direction test considers all of a defendant's contacts with the forum, "whether or not those contacts involve wrongful activity by the defendant"); *see also 42 Ventures, LLC v. Mav*, 2021 WL 5985018, at *1 (9th Cir. Dec. 16, 2021) (explaining that using web servers in the United States to store and disseminate infringing content might show purposeful availment and, alternatively, deliberately choosing servers in the United States to enable faster service to United States users could indicate purposeful availment) (mem.).

And if that analytical framework is not sufficiently complicated, the devil is truly in the details—the facts of this case raise the further question of where the alleged tortious actions "occurred" or were "committed," *Freestream*, 905 F.3d at 606, when Defendant used the Internet to commit the alleged infringement.

Some courts view tortious activity as occurring where the defendant is physically typing on the keyboard. *See, e.g.*, *Amberson Holdings LLC v. Westside Story Newspaper*, 110 F. Supp. 2d 332, 337 (D.N.J. 2000) ("It is unreasonable that by utilizing a New Jersey server [to host an infringing website], defendants' should have foreseen being haled into a New Jersey federal court. . . . [T]he administration, maintenance, and upkeep of defendants' website is all based out of California where the alleged infringement occurred."). Other courts view the

tortious activity as occurring at the location in which the defendant reaches into, via the instrumentality of the Internet, and that contains the computer hardware manipulated by the defendant to commit the tort.  *See, e.g.*, *Rhapsody Sols., LLC v. Cryogenic Vessel Alts., Inc.*, 2013 WL 820589, at *5 (S.D. Tex. Mar. 5, 2013) ("Numerous courts have exercised personal jurisdiction over nonresident defendants where the minimum contacts with the forum consisted of committing a tort through accessing a server located in the forum state.").

The F&R adopted the former view, by implication.  *See* ECF No. 78 at PageID ## 775–76 (assuming, without discussion, that Defendant's operating the mkvcage websites occurred outside the United States).  The court finds the latter view more reasonable.

Although instructive in understanding the purposeful-availment and purposeful-direction framework, *Freestream* is not helpful in resolving the more specific question of where an Internet tortfeasor has acted.[7]  *Freestream* concerned defamatory statements allegedly made by the defendants while they attended a conference in the forum state.  905 F.3d at 603.  To be sure, there is language in *Freestream* that could be construed as supporting either viewpoint, but *Freestream*

---

[7] *Wanat* does not answer that question either, because the servers used to commit the alleged torts in that case were located in the Netherlands.  *See* 970 F.3d at 1205; *see also id.* at 1212 n.8 (finding no personal jurisdiction and distinguishing a decision from the Fourth Circuit in which the defendant had "relied on U.S.-based servers" (quoting *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354 (4th Cir. 2020))).

never addressed *where* internet torts occur.  *See id.* at 605 (clarifying that the purposeful availment test applies to deliberate tortious actions taken within the forum, and explaining that neither *Yahoo!* nor *Mavrix* involved a tort allegedly committed while the defendant was "physically present in the forum state," but also explaining that *Yahoo!* "did not apply the effects test to the defendants' contacts that occurred within the forum—the sending of a cease and desist letter to, and service of process on, Yahoo!"); *see also Climax Portable Mach. Tools, Inc. v. Trawema GmbH*, 2020 WL 1304487, at *3 (D. Or. Mar. 19, 2020) ("Although *Freestream Aircraft* involved tortious conduct and alleged contacts where the tortfeasor was physically present in the forum state, the Ninth Circuit specifically noted certain types of contacts for which the effects test would not be appropriate, even though the contacts did not involve the tortfeasor being present in the forum state.  This included sending a cease and desist letter to the forum state and the serving of process in the forum state.  [905 F.3d at 605].  Thus, for the *Paccar* analysis to apply, the alleged tortfeasor need not be present in the forum state.").

   *Paccar International, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058 (9th Cir. 1985), is more helpful.  *Paccar*, cited with approval in *Freestream*, found purposeful availment in California where the defendant Kuwaiti bank sent an allegedly fraudulent payment demand from Kuwait to California.  757

F.2d at 1064.  That payment demand was sent over telex,[8] "a service for the carriage of two-way typewritten and data communications, sometimes called 'records,' between stations of subscribers," *Western Union Tele. Co. v. F.C.C.*, 674 F.2d 160, 162 (2d Cir. 1982).  *Paccar* thus directly supports the principle that a tortfeasor can commit tortious actions in a forum by reaching into the forum using inter-forum instrumentality, despite physically residing outside the forum.[9]

Two recent unpublished decisions from the Ninth Circuit endorse *Paccar*'s principle in the situation of torts committed through web servers.  *DEX Systems, Inc. v. Deutsche Post AG*, 727 F. App'x 276 (9th Cir. 2018), found specific personal jurisdiction over Dutch defendants in California because the defendants' contacts with California "include[d] the allegedly tortious conduct in California that gave rise to [plaintiff's] claims."  *Id.* at 278.  The tortious conduct sufficient to confer jurisdiction was "the allegedly infringing *use* of [plaintiff's] software [] in California on [plaintiff's] servers in Camarillo, California"—that

---

[8] *Paccar Int'l, Inc. v. Com. Bank of Kuwait, S.A.K.*, 587 F. Supp. 783, 784 (C.D. Cal. 1984), *vacated*, 757 F.2d 1058 (9th Cir. 1985) ("On May 1, 1984, CBK telexed Chase demanding payment of $1,492,566.60 under the letter of credit.").

[9] Another decision supporting that general principle, and which preceded the modern Internet age, is *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999).  *Wien* found specific personal jurisdiction in Texas over a foreign defendant who sent "letters, faxes, and phone calls to Texas" "contain[ing] fraudulent misrepresentations and promises and whose contents failed to disclose material information."  *Id.* at 212–15.  The Fifth Circuit held that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."  *Id.* at 213.

contact was sufficient despite the defendants having "sent print requests via VPN [from the Netherlands] to [plaintiff's] California server causing the software to engage and create output data [(i.e., infringement)] that was sent via the VPN connection to [defendants'] printers in Venlo, Netherlands." *Id.* (emphasis in original).

In *42 Ventures*, the Ninth Circuit remanded to the District Court of Hawaii to allow the plaintiff to "plead jurisdictional facts that might save its Complaint" given the complex nature of pleading personal jurisdiction in Internet tort cases. *See* 2021 WL 5985018, at *1. The court noted that "[u]sing servers in the United States to store and disseminate infringing content might qualify as in-forum use of a trademark, thus satisfying the first prong of the minimum contacts test by showing purposeful availment." *Id.* "And deliberately choosing servers in the United States to enable faster service to U.S.-based customers could indicate purposeful direction to the United States." *Id.* But because the plaintiff "did not allege that the servers were in fact located in the United States, as opposed to merely operated by U.S.-based companies (but perhaps located in other countries)," the Ninth Circuit remanded with instructions to grant leave to amend. *Id.*

Other courts of appeals have also found personal jurisdiction over an out-of-forum tortfeasor under the purposeful availment test when the tortfeasor

uses servers in the forum to commit the acts constituting the pertinent tort.  *See, e.g.*, *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) ("[Defendant] purposefully availed herself of the privilege of conducting activities within Connecticut . . . .  Most Internet users, perhaps, have no idea of the location of the servers through which they send their emails.  Here, however, [plaintiff] has alleged that [defendant] knew that the email servers she used and the confidential files she misappropriated were both located in Connecticut.  She used those servers to send an email which itself constituted the alleged tort.").

Numerous district courts have, too.  *See, e.g.*, *Climax Portable*, 2020 WL 1304487, at *4 ("Plaintiff alleges that the Individual Defendants, while in Germany, accessed [plaintiff's server], in Oregon, and allegedly accessed trade secret information for an unauthorized purpose . . . .  The question for jurisdiction purposes, therefore, is whether that alleged act constituted committing a tort 'in Oregon' or the tort of misappropriation in Germany, with an effect in Oregon.  The Court finds that the better analysis is that it was a tort that was at least in part committed in Oregon, even though the Individual Defendants were not physically present in Oregon, and thus falls under the 'purposeful availment' *Paccar* analysis."); *Watch Sys. LLC v. Sys. Design Sols., Inc.*, 2009 WL 5217085, at *6 (E.D. La. Dec. 31, 2009) ("Here Plaintiff alleges that Defendants intentionally hacked into Plaintiff's private server and intercepted several messages.  The act of

24

this alleged intrusion is, for the purposes of this opinion, essentially communication.  Therefore, since the content of the intrusion gave rise to the intentional tort, Defendants have purposely availed themselves of this forum."); *Rhapsody*, 2013 WL 820589, at *5 (collecting cases).

The court finds distinguishable numerous decisions holding that a defendant's contact with a non-party's website hosted in the forum is insufficient to confer personal jurisdiction.  *See, e.g.*, *Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) ("Plaintiff fails to provide, and the Court has not located, any case where the location of third-party servers, as opposed to servers affiliated with one of the parties, was sufficient to satisfy purposeful direction."); *Chang v. Virgin Mobile USA, LLC*, 2009 WL 111570, at *4 (N.D. Tex. Jan. 16, 2009) (finding insufficient contacts and rejecting plaintiff's argument that, "by virtue of the fact that [defendant] Virgin Australia (through its vendors) deliberately directed its activity toward [non-party] Flickr.com (i.e., by visiting the website and downloading the photograph from Flickr.com), Virgin Australia can be haled into any forum where Flickr.com's servers are located"); *see also Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 923 (8th Cir. 1995) ("Taken as a whole, the contacts between Trans Western and South Dakota are insufficient to support jurisdiction.  The use of [third-party-controlled] interstate facilities, such as telephones or mail, is a secondary or ancillary factor

and cannot alone provide the minimum contacts required by due process."
(internal quotation marks and citation omitted)).

And it is certainly true that not every contact with a party's forum-hosted website is sufficient to confer personal jurisdiction.  Even when a defendant commits a tort using a website hosted in the forum by a party to the litigation—either the plaintiff's website or the defendant's own website—the defendant's contact with the forum cannot be merely fortuitous or happenstance.  *See DEX*, 727 F. App'x at 278 ("Furthermore, that the software was located on [plaintiff's] California server was not merely a fortuitous occurrence. . . .  Rather, the software was located on California servers pursuant to an agreement reached by the parties. [The parties] actively set up the California-based VPN . . . ."  (citation omitted)); *Climax Portable*, 2020 WL 1304487, at *5 (collecting cases) ("Other courts also have found that acquisition of trade secrets from a server in the forum state with *knowledge of its location*, or other intentional and knowing improper use of a computer server in the forum state, creates enough minimum contacts to support personal jurisdiction, without analyzing the effects test."  (emphasis added)).

More generally, the court recognizes that the Internet has transformed how foreign defendants interact with the United States.  Tortious acts that once required international travel, and later the somewhat faster process of international mail, can now be accomplished in a matter of seconds with a few keystrokes and

mouse clicks. "One conclusion we might draw from this fact is that a physical geographical nexus is simply less important in cases where the alleged harm occurred over the Internet. Such a conclusion would not necessarily be inconsistent with due process," or require courts to rewrite personal-jurisdiction law. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 431 (7th Cir. 2010).

Rather, such a conclusion requires this court to examine novel issues at the contours of established personal-jurisdiction law. And in examining the novel issue at hand—where a defendant's actions "occur" or are "committed" when he or she uses the Internet to commit a digital tort—the court recognizes that a defendant's manipulating data in a computer by a complex process controlled from a remote location does not alter the fact that the manipulation of the data, i.e., creating conditions prohibited by tort law, occurs where the server is physically located. *See United States v. Ivanov*, 175 F. Supp. 2d 367, 371 (D. Conn. 2001) (setting forth similar rationale for criminal jurisdiction in a prosecution under the Computer Fraud and Abuse Act).

For those reasons, and considering the great weight of supporting authority, the court concludes that when a defendant uses the Internet to commit a tort confined to the digital realm, the defendant's tortious actions occur at the location of the computer (e.g., web server) that the defendant manipulates to commit the tort.

27

### 2.    Law Governing the Reasonableness of Jurisdiction—"Traditional Notions of Fair Play and Substantial Justice"

"Once it has been decided that a defendant purposefully established minimum contacts within the forum [], these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) (quoting *Int'l Shoe*, 326 U.S. at 320).  In making that determination, the court weighs seven factors:

> (1) the extent of the defendants' purposeful injection into the [forum's] affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's [forum]; (4) the [forum's] interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011).

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.  Nonetheless, "litigation against an alien defendant requires a higher jurisdictional barrier than litigation against a citizen from a sister state." *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 588 (9th Cir. 1993), *as amended* (Mar. 24, 1993).

**B.      Analyzing Due Process—Minimum Contacts Through Purposeful Availment**

    *1.      Purposeful Availment via Direct-Infringement Actions Occurring in the United States*

    Plaintiff argues that Defendant directly infringed its copyright on the motion picture *Hellboy* through three principle actions, all sufficient to confer personal jurisdiction under the purposeful availment test:  First, Defendant unlawfully reproduced by ripping legitimate copies of *Hellboy*; second, Defendant unlawfully distributed full or partial infringing copies of *Hellboy* through the BitTorrent network; and third, Defendant unlawfully reproduced and distributed by uploading infringing copies and torrent files onto known torrent websites.  *See* ECF No. 75-1 at PageID # 697; ECF No. 79-1 at PageID # 788.  The court finds, however, that Defendant did not purposefully avail himself of the privileges of conducting activities in the United States when committing the alleged direct infringements.

    For both allegations of ripping—ripping of the Blu-Ray disc and the Amazon.com stream—the infringing reproductions occurred when and where an unauthorized copy was fixed into computer memory, i.e., on the computer conducting the ripping process.  *See* 17 U.S.C. § 106(1) (protecting the right to "reproduce the copyrighted work in copies"); *id.* § 101 (defining "copies" as "material objects . . . fixed by any method now known or later developed").  The

fact that Defendant purchased the Blu-Ray disc from a retailer headquartered in the United States does not alter that conclusion; nor does the fact that the stream was sourced from Amazon's servers, which are presumably located in the United States. *See Superama Corp., Inc. v. Tokyo Broad. Sys. Television, Inc.*, 2019 WL 6879744, at *3 (C.D. Cal. Aug. 20, 2019), *aff'd*, 830 F. App'x 821 (9th Cir. 2020) ("Because the allegation here is that the material was downloaded from U.S. servers to computers in Japan, the Court determines . . . that this is insufficient to allege *domestic* infringement of the reproduction right under 17 U.S.C. § 106(1)." (emphasis added)).

The SAC does not specify where or on what computer Defendant ripped the Blu-Ray disc, and that fact is necessary to determine if the allegedly unlawful reproduction occurred in the United States. This omission is fatal to Plaintiff's argument on personal jurisdiction, *see Cripps*, 980 F.2d at 1267, because without it, there is no tortious activity occurring in the United States sufficient to satisfy the purposeful availment test.

The SAC also does not specify where or on what computer Defendant ripped the Amazon.com stream. The SAC does allege that Defendant streamed *Hellboy* to a computer with a United States-based IP address, implying that Defendant remotely controlled that computer as a virtual machine using his computer in Pakistan. But because two of Defendant's computers were involved in

30

the alleged streaming (i.e., the leased virtual machine in the United States and

Defendant's computer in Pakistan, which facilitated the remote connection to the

virtual machine), the ripping process could have occurred on either computer.  And

the failure to specify is fatal to Plaintiff's argument on purposeful availment at the

motion-for-default-judgment stage.  *See Cripps*, 980 F.2d at 1267 ("[N]ecessary

facts not contained in the pleadings, and claims which are legally insufficient, are

not established by default.").

   The second alleged direct infringement is Defendant's distributing full

or partial copies of *Hellboy* through the BitTorrent network.  Related to that

allegation, Plaintiff attached to the SAC a table of summarized packet captures

obtained by its investigative firm.  *See* ECF Nos. 64-1, 64-7.  That table

purportedly shows unauthorized transfers of full or partial copies of *Hellboy* to 35

computers in Hawaii over the BitTorrent network.  *See* ECF No. 64-1 (showing

recipient IP addresses in the first column, which were geolocated to Hawaii, as

shown in the seventh column under the heading "Region"); ECF No. 64 at PageID

## 610–611, ¶¶ 112–120.  The SAC alleges that similar transfers occurred to a total

of 16,942 leechers in the United States.  *See* ECF No. 64 at PageID ## 587–88,

¶ 24.  Conspicuously absent from the table, however, are the IP addresses and

corresponding locations of the sending computers, i.e., the seeders.  *See* ECF No.

64-1.  The SAC likewise omits allegations regarding the locations of the sending

computers—leaving the court guessing as to whether the sending computers were located in the United States or elsewhere, e.g., Pakistan.  The court cannot presume that the sending computers were located in the United States in order to find personal jurisdiction.  *See Cripps*, 980 F.2d at 1267.

And even assuming that half of the infringing-distribution actions occurred on Defendant's seeding computer(s) in Pakistan and that the other half occurred on the leechers' computers in the United States, the SAC still fails to allege facts sufficient for the purposeful availment test.  That is because transferring the infringing files into the United States, as opposed to elsewhere, was fortuitous from Defendant's perspective.  BitTorrent transfers can be initiated by anyone in the world with an Internet-connected computer, a BitTorrent client, and access to the torrent files associated with a particular target file.  Creating and maintaining connections with leechers required no action by Defendant other than leaving his seeding computer(s) connected to the Internet and running the BitTorrent client.  Under such circumstances, Defendant cannot be said to have purposefully contacted the United States, much less purposefully availed himself of the privileges of conducting activities in the United States.  *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), *as corrected* (May 12, 2014) (holding that defendant-company's sending emails to Indiana residents as part of email blasts to a larger subscriber list

was "entirely fortuitous" because the contacts with Indiana depended on "the users who signed up," i.e., activities "wholly . . . out of the defendant's control").

Plaintiff argues that "Defendant himself individually addressed and sent file pieces to 16,942 specific IP addresses in the US (including 35 in Hawaii) using a BitTorrent Client application." ECF No. 75-1 at PageID # 695; *see also* ECF No. 64 at PageID ## 587–88, ¶ 24. But that argument (and allegation) is not plausible—it is belied both by common sense and the sum of the allegations in the SAC, particularly (1) the explanation that "[t]he [leecher's] BitTorrent protocol *causes* the initial seeder's computer to send different pieces of the computer file," ECF No. 64 at PageID ## 608–09, ¶ 106 (emphasis added), and (2) the allegation that Defendant "sent [copies of *Hellboy*] *automatically* to specific IP addresses in the United States using a BitTorrent Client," *id.* at PageID ## 587–88, ¶ 24 (emphasis added). *See also Fung*, 710 F.3d at 1028 ("The [seeder's] job is essentially done; her computer will continue to communicate with the tracker assigned to the torrent file she uploaded, standing ready to distribute the movie file (or, more accurately, parts thereof) to others upon request. . . . The [leecher's] BitTorrent program will then contact the [seeders'] computers directly and begin downloading the pieces of the movie."). In short, Plaintiff's allegation is implausible and should thus be disregarded. *See CSTECHUS*, 2021 WL 4974825, at *2.

The third alleged direct infringement is Defendant's reproducing and distributing digital copies of *Hellboy* by uploading those copies onto torrent websites hosted in the United States, namely, 1337x.to and ibit.uno.  But that allegation is implausible, too, because it is belied by the sum of the allegations in the SAC.  Specifically, it is implausible that Defendant uploaded onto torrent sites the *Hellboy* movie files themselves, instead of just the torrent files associated with the movie files.  The SAC describes torrent sites as "websites that index *torrent files* that are currently being made available for copying and distribution by people using the BitTorrent protocol."  ECF No. 64 at PageID # 608, ¶ 103 (emphasis added).  The SAC also describes how "[o]nce the initial seeder has created a *torrent* and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file *to which the torrent is linked* (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the [leechers] installed on their computers."  *Id.*, ¶ 105 (emphasis added).  And in describing Defendant's mkvcage torrent websites, the SAC alleges that "torrent files [are] downloaded" from those torrent websites.  *Id.*, ¶ 104.

The SAC's descriptions of torrent websites—excluding the allegation that actual movie files can be uploaded onto them—is consistent with the Ninth Circuit's descriptions in *Fung*:

> The movie file, we shall assume, is quite large, and is already on the publisher's computer. . . .

> To share her copy of the movie file, the publisher first creates a very small file called a 'torrent' or 'dot-torrent' file . . . .  The torrent file is quite small, as it contains none of the actual content that may be copyrighted but, instead, a minimal amount of vital information. . . .
>
> Second, the publisher makes the torrent file available by uploading it to one or more websites ('torrent sites') that collect, organize, index, and host torrent files. . . . BitTorrent users thus rely on torrent sites to find and share torrent files.

710 F.3d at 1027 (footnotes omitted).  Indeed, it would make little sense for a "torrent website" to host and provide downloads for the larger movie files.  That would defeat the purpose of a torrent network's peer-to-peer architecture, which achieves greater reliability than a traditional client-server architecture in transferring large files because it does not suffer from bottleneck issues.  *See id.* at 1024–26.  For those reasons, the court finds implausible Plaintiff's allegation that Defendant uploaded movie files onto torrent websites in the United States.[10]

Lastly, if Defendant uploaded onto the torrent sites torrent files associated with the *Hellboy* movie (as the SAC also alleges), then there is no reproduction infringement, because the torrent files do not contain copyrighted material.  *See Fung*, 710 F.3d at 1028 ("Because the torrent sites typically contain only torrent files, no copyrighted material resides on these sites."); 17 U.S.C.

---

[10] The court also inspected the screenshots of those torrent websites provided in the SAC and the attachments to the SAC.  The court is satisfied that those screenshots demonstrate that the torrent sites, i.e., 1337x.to and ibit.uno, do not provide direct downloads of movie files.

§ 106(1) (protecting the right to "reproduce the copyrighted work in copies").  It is also dubious that there could be distribution infringement via the torrent-file uploads.  *See* 17 U.S.C. § 106(3) (protecting the right to "distribute *copies* or phonorecords of the copyrighted work to the public" (emphasis added)).  But even if there could be, Defendant's uploading those torrent files onto a website hosted in the United States, as opposed to elsewhere, was a fortuitous contact that does not satisfy the purposeful availment test.  *See Chang*, 2009 WL 111570, at *4 (defendant's visiting a third-party's website hosted in the forum and downloading content from that website insufficient to establish purposeful availment).

### 2.   *Purposeful Availment via Contributory-Infringement Actions Occurring in the United States*

Plaintiff argues that Defendant contributorily infringed its copyright by operating the mkvcage torrent websites, and that such allegations are sufficient to confer personal jurisdiction under the purposeful availment test.  *See* ECF No. 75-1 at PageID ## 692–93, 697; ECF No. 79-1 at PageID ## 787, 794.  The court agrees.

"Traditionally, one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001), *as amended* (Apr. 3, 2001) (internal quotation marks and citation omitted).  There must be direct infringement by some person or

entity in order for there to be a secondary contributory infringement.  *See id.* at 1013, n.2.

Plaintiff claims that Defendant contributed to the direct infringements of the 16,942 persons in the United States who downloaded a pirated copy of *Hellboy* over the BitTorrent network.  Defendant induced and/or materially contributed to those direct infringements through the following actions: creating the pirated digital copies through ripping actions; initially seeding those digital copies; publishing the torrent files associated with those copies onto the mkvcage websites; promoting those torrent files and his websites over social media; and seeding the pirated digital copies for transfers to the direct infringers.  *See* ECF No. 75-1 at PageID ## 699, 703–05.  Plaintiff emphasizes that Defendant operated the mkvcage websites and disseminated the torrent files through those websites: "Defendant . . . suppl[ied] the website that facilitates, encourages, enables, and creates direct links between website users, infringing operators of the torrent services, and file copies provided by Defendant, and by actively encouraging, promoting, and contributing to the use of the website for blatant copyright infringement."  ECF No. 64 at PageID # 622, ¶ 166.  The court finds these allegations sufficiently plausible to sustain a contributory-infringement claim.  *See Napster*, 239 F.3d at 1019–22 (affirming lower court's likelihood-of-success

finding that the Napster peer-to-peer file-sharing platform contributorily infringed copyrights on user-shared files).

And most important, the court also finds, assuming the SAC's allegations are true, that Defendant committed tortious actions in the United States in service of his contributory infringement.  Defendant hosted his mkvcage websites on servers leased to him in the United States.  ECF No. 64 at PageID ## 589–90, ¶ 28.  Accordingly, Defendant's publishing and promoting of infringement-enabling torrent files, and his general facilitating of connections between direct infringers, occurred in the United States.  As the court found earlier, *see supra* Part IV.A.1, "when a defendant uses the Internet to commit a tort confined to the digital realm, the defendant's tortious actions occur at the location of the computer (e.g., web server) that the defendant manipulates to commit the tort."  Furthermore, the acts of direct infringement also occurred in the United States—where BitTorrent leechers reproduced digital copies of *Hellboy* on their computers after transferring data from Defendant's seeding computer(s).

And Defendant's contacts with the United States in operating his websites and uploading the torrent files were not fortuitous or happenstance.  The SAC alleges that Defendant specifically chose servers with United States-based IP addresses so he could overcome blacklist restrictions that search engines often apply to purported piracy websites hosted on foreign servers, and to increase

service speed to users visiting his websites from the United States.  ECF No. 64 at PageID ## 597–98, 602, ¶¶ 56, 73.  The court finds those allegations plausible and evincing sufficient intent to satisfy the purposeful availment test.  *See MacDermid*, 702 F.3d at 730 (defendant's knowledge and use of in-forum email servers to commit alleged tortious actions satisfied the purposeful availment test).  Those findings are not undercut by the fact that Defendant committed some infringement-contributing actions outside the United States, e.g., ripping the Blu-Ray copy of *Hellboy*, or that the knowledge element was technically satisfied outside the United States.

### 3.  *Claims Arising Out of or Relating to Forum-Related Conduct*

The second prong of the minimum-contacts test requires that Plaintiff's contributory-infringement claim arise out of or relate to the in-forum activities supporting purposeful availment or the out-of-forum activities supporting purposeful direction.  *See Wanat*, 970 F.3d at 1208.  That requirement is satisfied because Defendant contacted the United States when he operated the mkvcage websites and uploaded torrent files onto those websites—the crux of Plaintiff's contributory infringement claim.  So, too, did the direct infringers when they received digital copies of *Hellboy* from Defendant's computer(s) over the BitTorrent network.

### 4. *Jurisdiction Comports with Traditional Notions of Fair Play and Substantial Justice*

The minimum-contacts test also requires the court to determine whether the exercise of personal jurisdiction is reasonable under the due process clause. *See Burger King*, 471 U.S. at 476–77. Having considered the seven factors relating to reasonableness, *see CollegeSource*, 653 F.3d at 1079, the court finds that the balance of those factors supports exercising personal jurisdiction over Defendant.

Five factors weigh in favor of personal jurisdiction. For the first factor, as explained above, Defendant purposefully injected his tortious actions into the United States. For the third factor, the court perceives no conflict between the United States and Pakistan (or any other country, for that matter) with respect to enforcing Plaintiff's United States copyright. Moreover, legal guardrails exist to prevent United States law from encroaching on the sovereignty of other states. *See, e.g.*, *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1098 (9th Cir. 1994) ("United States copyright laws do not reach acts of infringement that take place entirely abroad."). For the fourth and sixth factors, the United States has a strong interest in remedying torts committed against a citizen corporation[11] through injunctions that can be effectively enforced by Internet-service companies

---

[11] "Plaintiff is a corporation organized and existing under the laws of the State of Nevada." ECF No. 64 at PageID # 600, ¶ 64.

in the United States, *see* ECF No. 64 at PageID ## 626–27.  And for the fifth factor, the United States is the most efficient forum to resolve this controversy because most of the evidence in this case is located in the United States.  *Cf. Paccar*, 757 F.2d at 1066 (finding that "California is a poor choice as a forum" because "[m]ost of the evidence . . . is located in Kuwait").

Although the second factor counsels against jurisdiction—the foreign Defendant is clearly burdened by having to litigate in the United States—that single factor is strongly outweighed by the five factors discussed above.[12]  In short, the court is satisfied that jurisdiction is reasonable in this case, even considering the foreign residence of Defendant.  *See DEX*, 727 F. App'x at 278–79 (finding jurisdiction on similar facts) ("To the extent [defendant] has any argument [as to the unreasonableness of jurisdiction], we find it insufficient to meet the 'compelling case' requirement . . . ." (citation omitted)); *MacDermid*, 702 F.3d at 731 (finding jurisdiction on similar facts).

C.    **Analyzing Jurisdiction in Other States' Courts of General Jurisdiction**

Plaintiff has established the first and third requirements for personal jurisdiction under the federal long-arm statute.  *See* Fed. R. Civ. P. 4(k)(2).  The second requirement mandates that there be no jurisdiction in any state's courts of

---

[12] The court finds no reason to assess the seventh factor (whether an alternative forum exists) given that the other factors weigh overwhelmingly in favor of jurisdiction.

general jurisdiction.  *See id.*; *Hueter v. Kruse*, 2021 WL 5989105, at *14–15 (D. Haw. Dec. 17, 2021).

The SAC alleges a slight connection to California:  Defendant used Cloudflare, Inc., a company headquartered in California, for domain name services.  *See* ECF No. 64 at PageID ## 589–90, ¶ 28.  Also, Defendant uploaded torrent files associated with the *Hellboy* movie onto a torrent website hosted in California.  *See id.* at PageID # 586, ¶ 20.  But those allegations are insufficient to establish purposeful availment in or purposeful direction to California under the constitutionally required minimum-contacts test.  *See Wanat*, 970 F.3d at 1212 (use of domain-name-service providers in the United States insufficient for purposeful direction); *Chang*, 2009 WL 111570, at *4 (defendant's visiting a third-party's website hosted in the forum and downloading content from that website insufficient to establish minimum contacts).

For the same reasons, the SAC's allegations concerning Texas—that Defendant uploaded torrent files onto a website hosted in Texas—are also insufficient to establish minimum contacts under the Constitution.

Arizona presents the closest possibility, as the SAC alleges that Plaintiff's infringement-inducing websites were hosted on servers located in Arizona.  But, crucially, the allegations supporting purposeful availment in the United States do not suggest Defendant acted with a specific purpose regarding

42

Arizona as opposed to any other state.  Rather, those allegations indicate that Defendant sought a *United States*-based IP address to circumvent blacklist restrictions, desired a server location that would better serve his *United States* users, and profited from non-geolocated advertisements tailored to the *United States* market.  Those allegations do not establish sufficient minimum contacts under the Constitution with respect to the State of Arizona.  *Cf. Mavrix*, 647 F.3d at 1230 (purposeful availment in California satisfied by website that "anticipated, desired, and achieved a substantial California viewer base").[13]

Defendant has negligible contacts with the remaining states, and the differences between those contacts are minimal.  At most, those states are home to BitTorrent users who leeched digital copies of the *Hellboy* movie from Defendant's seeding computer(s).  Defendant could not be sued in those states.

Because there is no personal jurisdiction in any state's courts of general jurisdiction, Plaintiff has met its burden in establishing personal jurisdiction under the federal long-arm statute.  But Plaintiff has only done so for its contributory infringement claim, *see supra* Part IV.B.  Nevertheless, the court

---

[13] True enough, in some cases, purposeful availment could be satisfied merely by a defendant's committing a tort using a web server that he knew was located in the forum state. *See Dex*, 727 F. App'x at 278.  But here, Defendant also needed to contact many other states in order to complete the alleged contributory infringement, as pled in the SAC—he needed to transfer files to direct infringers located in numerous states, including Hawaii; he need to sustain his websites using advertisements that targeted the United States as a whole; and he need to procure services for his websites and promote those websites using United States companies.

exercises its discretion to assert pendent-claim personal jurisdiction over

Defendant with respect to the other claims in this case, to the extent there are any.[14]

*See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th

Cir. 2004) ("[A] court may assert pendent personal jurisdiction over a defendant

with respect to a claim for which there is no independent basis of personal

jurisdiction so long as it arises out of a common nucleus of operative facts with a

claim in the same suit over which the court does have personal jurisdiction.").

///

///

///

///

///

///

///

///

///

///

///

---

[14] Some of the direct infringement claims may run afoul of *Subafilms*, 24 F.3d at 1098 ("United States copyright laws do not reach acts of infringement that take place entirely abroad.").

# V. **CONCLUSION**

For the foregoing reasons, the court has personal jurisdiction over Defendant for all claims in the SAC.  Accordingly, Plaintiff's Objections to the March 29, 2022 F&R, ECF No. 79, are SUSTAINED, and the F&R, ECF No. 78, is REJECTED.  The court refers to the magistrate judge the issues remaining in Plaintiff's Motion for Default Judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 13, 2022.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*HB Prods., Inc. v. Faizan*, Civ. No. 19-00487 JMS-KJM, Order Sustaining Plaintiff's Objections, ECF No. 79, to the March 29, 2022 Findings and Recommendation, ECF No. 78